IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PILOT AIR FREIGHT CORP.** : | |
|     Plaintiff : | |
| : | CIVIL ACTION |
| v. : | |
| : | |
| **V. C. ENTERPRISES, INC.** : | NO. 04-5568 |
|     Defendant : | |
| : | |

<u>MEMORANDUM AND ORDER</u>

**Tucker, J.**                                                                                                                                                       **March 6, 2008**

Presently before this Court are cross motions for partial summary judgment (Docs. 25, 26, 28, 29 and 30).

<u>BACKGROUND</u>

Plaintiff operates a network of freight forwarding stations situated at airports across the country and abroad. Plaintiff's freight stations are operated by third-party franchisees or independent managers or by Plaintiff's own corporate personnel. On or about July 3, 1995, the Plaintiff and the Defendant entered into a management agreement for the Defendant to manage Plaintiff's Detroit, Michigan stations. (Exhibit "A"). The agreement was set to expire no later than July 3, 2005; Plaintiff assumed the management of the station on September 1, 2004.

In exchange for being a part of Plaintiff's system and operating under its name and mark in an exclusive sales territory, for a set term, independent managers received compensation based on their station's revenues, less certain costs and expenses. Plaintiff alleges that the Defendant was not fully exploiting its territory, as required by the agreement and evidenced in the Defendant's underperforming sales. Plaintiff further charges that the lack of sales is directly attributable to Defendant's failure to maintain a sufficient trained, managed, and qualified sales

1

staff.

Plaintiff also alleges that in July 2004 Defendant requested early termination of the agreement. On September 1, 2004, Plaintiff hand-delivered a letter to the Defendant regarding the termination, and peacefully, at the Defendant's request, assumed control over the operations of the Detroit station from the Defendant. (Exhibit "C"). Plaintiff claims that Defendant never disputed any of the facts or circumstances set forth in the September 1, 2004 letter. On or about November 3, 2004, an attorney for the Defendant sent Plaintiff a letter advising Plaintiff that Defendant was accusing Plaintiff of "improperly" terminating the agreement and of not honoring the Defendant's rights to an exclusive territory and threatening suit. (Exhibit "D"). Plaintiff further alleges that Defendant received credit for all sales in its territory during the term of the agreement and that Defendant never raised any contention prior to the termination that it did not receive compensation.

Defendant V. C. Enterprises counters that Plaintiff committed pre-termination breaches by allowing other stations to conduct business in areas that Defendant argues were within its Area of Primary Responsibility ("APR"), in particular South Bend, Indiana and the Upper Peninsula of Michigan. These allegations are at the center of each parties partial summary judgment motion. Plaintiff contends that the South Bend and Upper Peninsula territories were never part of Defendant's APR and request that the Court grant partial summary judgment in its favor. Additionally, Plaintiff asserts that should the Court determine that the disputed areas are part of Defendant's APR, any counterclaims are barred by the Statute of Limitations and the Doctrine of Laches. Upon reviewing the motions and submissions, the Court concludes that (1) Defendant's Motion is denied in part as to South Bend, Indiana because genuine issues remain;

(2) Defendant's Motion is granted in part as to the Upper Peninsula of Michigan and (3) any counterclaims asserted by Defendant are barred by the Statute of Limitations and the Doctrine of Laches, thus granting in part Plaintiff's motion.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. R. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis of its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. R. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." Celotex, 477 U.S. at 322. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against opponent, even if the quality of the movant's evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## DISCUSSION

I. Defendant's APR

At the center of this dispute is the parties' intent regarding Defendant's APR as demonstrated by the Agreement and extrinsic evidence offered by the parties in support of their briefs. As noted in the Third Circuit opinion, Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., the "strongest external sign of agreement between contracting parties is the words they use in their written contract." 619 F.2d 1001, 1009 (3d Cir. 1980).

It is Plaintiff's contention that the darkened lines at the edges of the map that accompanied the agreement served as the boundary for Defendant's APR and placed the territories of South Bend and Northern Michigan outside the designated region. Defendant counters that the map includes only a small portion of Indiana in which South Bend is the only city of any significant size. They further argue that because the contract explicitly names Indiana as part of its APR and the regions beyond South Bend included on the map are primarily undeveloped, it is clear that the APR included South Bend.

The parties' agreement includes an integration clause stating that the agreement "contains

all of the parties of the agreements, warranties, covenants and representations. This Agreement cannot be changed, supplemented or modified orally. All prior Agreements, understandings, representations, warranties and any negotiations, if any, are merged into this Agreement." Thus, the Court must first determine whether or not the terms of the agreement are sufficiently ambiguous to warrant further clarification. When reviewing a contract, the Court expects that "the intent of the parties to an instrument is 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" Hullet v. Towers, Perrin, Forster, Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994) (citing Dauphin v. Fidelity & Deposit Co., 770 F.Supp. 248, 251 (M.D. Pa.), aff'd 937 F.2d 596 (3d Cir. 1991)). Here, the agreement states that Defendant's territory was "in Michigan, Ohio and Indiana as evidenced by attached map." The agreement includes a map with the aforementioned territories with dark, bold lines that Plaintiff asserts "carve out the territory." The lines appear to be hand drawn and are not accompanied by any further markings or language. Further, while the agreement identifies the territories, it does not offer any writing as to the meaning of the lines or how the lines should be interpreted. Thus, to accept either party's theory on the usefulness of the lines, additional evidence is necessary. Because of the ambiguity of the APR clause in the agreement, the Court will accordingly review the materials submitted by both parties as it pertains to South Bend, Indiana and the Upper Peninsula region of Michigan. Hullet, 38 F.3d at 111 ("[A] contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations."); National Data Payment Sys., Inc. v. Meridian Bank, 18 F.Supp.2d 543, 547 (E.D. Pa. 1998) ("A contract is ambiguous only 'if it is reasonably susceptible of different constructions and capable of being understood in more than one

sense.'").

    A.  South Bend, Indiana

As it pertains to South Bend, Indiana, there is still a genuine issue as to whether the parties intended for the location to be part of Defendant's APR.  In support of its assertion that the parties intended for South Bend to be included, Defendant argues that South Bend is the only city of any significant size located on the agreement map.  It is further argued that the areas located on the map beyond South Bend are mostly undeveloped and would not reasonably serve the purpose of the contract.  VC Enterprises also brings to the Court's attention a zip code list that it contends represents its APR.  The list was obtained by Defendant as a result of a second set of admissions from Plaintiff.  While Plaintiff challenges reliance upon the zip code list arguing that the language of the agreement should control, the ambiguous words and lines, warrant the consideration of additional information.  Because the zip code list does not include any locations in Indiana, which is in direct contradiction to the written language of the agreement, they argue that the carve out lines on the map should be disregarded and South Bend determined as part of the APR based on the map.  Plaintiff counters that Defendant's complete absence of sales in the area along with its failure to bring the area up in previous discussions demonstrates that the parties did not intend for South Bend's inclusion in the APR at the time of agreement.

The Court agrees that the written language and lines are too ambiguous to demonstrate the parties intent as it pertained to South Bend.  Further, the Court is not satisfied that the absence of sales activity and dearth of discussion of South Bend, as Plaintiff argues, amount to evidence sufficient for the Court to conclude that the darkened lines on the map fully expressed

the parties' intent. However, while the Court has concluded that the line on the map is ambiguous and warrants additional evidence, it is also not satisfied that Defendant's submissions of the zip codes and additional testimony meet the summary judgment standard. Just as the Court is not convinced that a lack of sales means there was never an intent to include South Bend, the absence of zip codes in Indiana does not readily lend itself to any conclusions about the parties' intent. Thus, what remains is a genuine issue regarding a material fact and summary judgment as to both parties' claims regarding the South Bend territory is denied.

      B. Upper Peninsula, Michigan

As previously noted, the Court finds the words of the agreement and darkened lines on the attached map too ambiguous to fully express the parties' intent as to Defendant's APR. Here, a review of the agreement along with the extrinsic evidence offered by both parties leads the Court to conclude that the Upper Peninsula was part of the territory assigned to Defendant. The language makes it clear that the parties intended that Michigan be part of Defendant's APR when they entered into an agreement. See Percy A. Brown & Co. v. Raub, 54 A.2d 35, 43 (Pa. 1947) ("[Contracts] must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, if that intention can be ascertained from their language."). While the absence of any zip codes in Indiana was not compelling as it pertained to South Bend, the presence of zip codes in the Upper Peninsula of Michigan leads the Court to conclude that the territory was part of Defendant's APR. While the assignment of the Upper Peninsula region of Michigan does not on its face amount to an act of bad faith by the Plaintiffs, it also does not sufficiently defeat the persuasiveness of the zip codes in support of Defendant's argument. Accordingly, the Court finds that the Upper Peninsula of Michigan was part of Defendant's

APR.

II. Defendant's Counterclaims

Defendant next requests that if either one or both of the disputed territories are determined as part of its APR, that the Court then conclude that Plaintiff is in breach of the contract. However, the counterclaims are barred due to untimeliness. Under Pennsylvania law, the Statute of Limitations for a contract claim is four years, starting from the point at which the right to bring and maintain a suit emerges. 42 Pa.C.S.A. §5525(a)(I); Weik v. Estate of Brown, 794 A.2d 907, 909 (Pa.Super. 2002). See also Boyle v. State Farm Mutual Automobile Ins. Co., 456 A.2d 156, 158 (1983) (stating that the determination of whether the statute of limitations has run is for the Court).

Here, the Defendant seeks lost credit on the sales made by other stations in the disputed territory from the beginning of the contract, July 3, 1995 until September 1, 2004. It is their position that the Statute of Limitations did not begin until September 1, 2004, the date upon which the parties agreed to terminate the contract. The Court disagrees with this assertion. Defendant further asserts that the parties entered into a continuing contract, which stipulates that the termination date is the point at which the Statue of Limitations begins to run. Contracts requiring periodic payments are not necessarily also continuing contracts. Total Control, Inc. v. Danaher Corp., 359 F.Supp.2d 387, 391 (E.D. Pa. 2005). While the agreement required periodic payments, each payment was for the amount due Defendant. Separate causes of action for sales credits would have accrued monthly thus precluding its interpretation as a continuing contract for purposes of tolling the Statute of Limitations.

Additionally, as argued by Plaintiff on the issue of the APR, the correspondence between

the parties does not suggest any efforts on Defendant's behalf to assert its rights within the disputed territory.  Where the lack of diligence in failing to institute an action prejudices another party, the claim is barred by the doctrine of laches.  Defendant's counterclaims stem from the interpretation of its APR–an issue dating back to the start of the agreement on July 3, 1995.  The correspondence between the parties suggests that the assertion of rights in the disputed area were not substantively raised until the contract's termination in 2004.  During this period of time, the individual who prepared the map for the agreement and created the darkened black line, Dan Letourneau, died.  Because of the lapse of time and prejudicial effect on Plaintiff, the counterclaims are also barred under the doctrine of laches.

       For these reasons, Plaintiff's motion to dismiss Defendant's counterclaims is granted.  An appropriate Order follows.